## In re BLECH SECURITIES LITIGATION.

### No. 94 Civ. 7696(RWS).

United States District Court, S.D. New York.

April 1, 1997.

As Amended April 4, 1997.

Kaplan, Kilsheimer & Fox (Robert N. Kaplan, Richard J. Kilsheimer, of counsel), Milberg, Weiss, Bershad, Hynes & Lerach (David J. Bershad, Richard H. Weiss, Brad N. Friedman, of counsel), New York City, Gilman and Pastor by Kenneth G. Gilman, Peter A. Lagorio, Boston, MA, for Plaintiffs.

Weil, Gotshal & Manges (Dennis J. Block, Irwin H. Warren, Suzanne J. Romajas, of counsel), New York City, for Defendant Bear, Stearns & Co., Inc.

De Feis O'Connell & Rose (Gregory J. O'Connell, of counsel), Schlam Stone & Dolan (Bennette D. Kramer, of counsel), New York City, for Defendant Mordechai Jofen.

Robert N. Swetnick, New York City, for Defendant Nicholas Madonia.

SWEET, District Judge.

In these consolidated class actions alleging securities and common law fraud, defendants Mordechai Jofen ("Jofen"), Nicholas Madonia ("Madonia") and Bear, Stearns & Co., Inc. ("Bear Stearns") have moved separately to dismiss the claims brought against them in Plaintiffs' Second Amended Complaint (the "Complaint")[1] on two grounds: first, for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b); second, for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below:

1. Mordechai Jofen's motion to dismiss for failure to plead fraud with particularity will be granted in its entirety, with leave to replead.

2. Nicholas Madonia's motion to dismiss will be denied.

3. Bear Stearns' motion to dismiss will be denied with respect to the Section 10(b) and common law fraud claims and granted with respect to the Section 20(a) control person liability claims.

## Parties

### I. The Plaintiffs

Each of the seventeen named plaintiffs[2] in these actions purchased stock in the securities of certain companies, (the "Blech Securi-

---

1. In this opinion, references to the Second Amended Complaint will be cited as follows: Compl. ¶ —.

2. The named plaintiffs are Elizabeth Ann Bronson, Raizy Levitin, Jay Schecter, Abraham Gar-

finkel, Dean L. Dachenbach, Thomas L. Mays, Timothy D. Pekes, Robert Libauer, Edward Fritche, Edward Mehfar, Richard Bell, George Ehlert, Georganne Ehlert, Karen Zully, James E. Bridges, Morton Garfinkel, Steven Ehrlich, and James Wright.

ties"),[3] between October 13, 1993, and September 7, 1994. They seek to bring this action on behalf of a class of persons similarly situated.

## IX. *The Moving Defendants*

Defendant Madonia is named in the Complaint as the designated trustee of the Celestial Charitable Remainder Unitrust, the Century Charitable Remainder Unitrust, the Freedom Charitable Remainder One Trust, the Frontier Charitable Remainder Unitrust, the Island Charitable Remainder Unitrust, the Lake Charitable Remainder Unitrust, the Ocean Charitable Remainder Unitrust, the Sentinel Charitable Remainder Unitrust, and the Bleck Family Trust. Madonia is a Certified Public Accountant who has performed accounting services for Defendant David Blech ("Biech") or D. Blech & Co. Inc. ("Blech & Co.") a broker-dealer whose managing director and sole shareholder was Blech.

Defendant Jofen, Blech's cousin, is named as the designated trustee of the Edward Blech Trust.[4]

The Blech Trusts are charitable remainder trusts established by Blech as settlor. Blech is the income beneficiary and is entitled to receive annual minimum distributions from the trust assets of all of the Blech Trusts, except the Blech Family Trust and the Edward Blech Trust, whose income beneficiary is Blech's minor son Edward.

Defendant Bear Stearns is an investment banking and securities trading and brokerage firm organized and existing under the laws of Delaware with its principal place of business in Manhattan. Bear Stearns is registered with the Securities and Exchange Commission (the "SEC") and is a member of the National Association of Securities Dealers ("NASD"). Bear Stearns acted as Blech & Co.'s clearing agent for all securities transactions involving Blech & Co. from September 1993 through the end of the relevant class period.

## III. *The Remaining Non–Moving Defendants*

By opinion dated June 6, 1996, this Court granted the motions of various defendants to dismiss the claims asserted against them in the Amended Consolidated Complaint, granting leave to replead within twenty days. *In re Blech Securities. Litigation,* 928 F.Supp. 1279 (S.D.N.Y.1996). Plaintiffs filed their Second Amended Complaints on July 26, 1996. The Second Amended Complaint did not include allegations against twelve "Issuer Defendants" who had been named in the prior complaint. The remaining defendants, who have not moved to dismiss the Second Amended Complaint, are described below.

Defendant David Blech, a resident of New York, was at all times material to this action managing director and sole shareholder of Blech & Co.

Blech & Co., a New York corporation with its principal place of business in Manhattan, is a registered broker-dealer. During the period relevant to this case, Co. acted as underwriter or market-maker or both for numerous companies, primarily in the biotechnology field. Blech & Co. ceased operations on September 22,1994, having failed to maintain minimum capital requirements. At that time, Blech & Co. was the principal market-maker for the Blech Securities and had about six-thousand customer accounts in offices in New York, Boston, Atlanta, and Boca Raton, Florida.

Defendant Mark S. Germain ("Germain") was at all material times a Managing Director of Blech & Co. Germain served on the board of directors of ASI, Ecogen, Microprobe, Neoprobe, LXR, NeoRX, Pharmos, and Genemedicine, companies that were named as issuer defendants in the prior complaint and whose stocks were Blech Securities.

Defendant Chancellor Capital Management, Inc. ("Chancellor") is a corporation

---

**3.** The term "Blech Securities" refers to the securities a number of biotechnology companies, 12 of whom were named as defendants in the prior complaint. These companies are not named as parties in this Second Amended Complaint.

**4.** All of the trusts will be referred to collectively as the "Blech Trusts" and Madonia and Jofen will be referred to as the "Trustee Defendants."

with its principal place of business in Manhattan. It has been registered with the SEC as an investment advisor since 1973. Chancellor's investment management activities on behalf of its managed accounts are conducted by four business units, one of which is the Alternative Asset Management Group ("AAMG"). Defendant Parag Saxena ("Saxena") was a managing director of Chancellor and a member of the AAMG.

Defendant Baird Patrick & Co. ("Baird Patrick") is a registered broker-dealer with its principal place of business in Manhattan. Baird Patrick is registered with the SEC and is a member of the NASD. During the period of time relevant to this action, Baird Patrick was a market-maker for certain Blech Securities.

### Prior Proceedings

The prior proceedings in this action are set forth in the prior opinions of this court, familiarity with which is assumed. *See In re Blech Securities Litigation*, 928 F.Supp. 1279 (S.D.N.Y.1996) (*"Blech I"*); *In re Blech Securities Litigation*, 1997 WL 20833 (S.D.N.Y. January 21, 1997) (*"Blech II"*).

*In re Blech Securities Litigation* represents several class actions, which have been consolidated pursuant to a stipulation and pretrial order dated December 12, 1994. Plaintiffs filed an amended consolidated class action complaint (the "Amended Complaint") on March 28, 1995.

By opinion dated June 6, 1996, this Court granted in part and denied in part the motions of various defendants to dismiss the claims alleged against them in the Amended Complaint. Specifically:

1. David Blech's and Blech & Co.'s motions to dismiss for failure to plead fraud with particularity were granted as to the complaint's RICO Claims and denied as to the remaining claims. Their motions to dismiss the control person claims for failure to state a claim were granted. Their motions to dismiss the Section 10(b) and common law fraud claims were denied.

2. Mark Germain's motion to dismiss for failure to plead fraud with particularity was granted as to the RICO claims and denied as to the remaining claims. His motion to dismiss the Section 10(b) and common law fraud claims for failure to state a claim was denied.

3. Mordechai Jofen's, and Nicholas Madonia's motions to dismiss for failure to plead fraud with particularity were granted in their entirety.

4. The Issuer Defendants' motions to dismiss for failure to plead fraud with particularity were granted in their entirety.

5. Bear Stearns' motion to dismiss for failure to plead fraud with particularity was granted as to the RICO claims, and its motion to dismiss for failure to state a claim was granted as to the Remaining Claims.

6. Baird Patrick's motion to dismiss for failure to plead fraud with particularity was granted as to the RICO Claims and denied as to the Remaining Claims. Its motion to dismiss for failure to state a claim was denied.

7. Chancellor's and Saxena's motions to dismiss for failure to plead fraud with particularity was granted as to the RICO Claims and denied as to the Remaining Claims. Their motions to dismiss for failure to state a claim were denied as to the claims brought by plaintiffs Dachenbach and Pekes and granted as to the claims brought by the other plaintiffs.

8. The motions to dismiss the Section 10(b) claims arising from trades in securities not purchased by the named plaintiffs were denied.

9. The motions to dismiss all claims arising from acts prior to October 21, 1991 was granted.

Plaintiffs were granted leave to replead within twenty days of the decision.

The Second Amended Complaint was filed on July 26, 1996. Jofen filed his motion to dismiss the Second Amended Complaint on August 30, 1996. Madonia filed his motion on September 3, 1996. Bear Stearns filed its motion on September 12, 1996. Oral argument was heard on November 20, 1996, at

which time the motions were deemed fully submitted.

### Causes of Action

The first claim for relief sought by Plaintiffs ("Count One") is brought against all of the defendants for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Compl. ¶¶ 98–103.

Count Two, alleging control person liability in violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), is brought, for purposes of the instant motions, against Bear Stearns. Compl. ¶¶ 104–109.

Count Three is brought against all defendants for common law fraud and deceit. Compl. ¶¶ 110–114.

### Facts

The facts as presented here are drawn from the Second Amended Complaint and do not constitute findings by the Court. Plaintiffs allege a scheme of market manipulation which had the purpose and effect of inflating the market prices of the Blech Securities which were underwritten by Blech & Co. or for which Blech & Co. was a principal market-maker. Many of the factual allegations relating to the market manipulation scheme are similar to those alleged in the prior complaint, the details of which are set forth in the prior opinion of the court. *See Blech I,* 928 F.Supp. at 1286–88. The allegations with respect to the overall scheme are summarized below. The specific allegations with respect to the moving defendants follow.

### I. Summary of the Manipulative Scheme

This class action alleges a scheme to manipulate the market for Blech Securities during the period from July 1, 1991 through September 21, 1994 (the "Class Period"). The Complaint alleges that the Plaintiffs, who purchased Blech Securities at artificially inflated prices during the Class Period, suffered damages when the entire scheme collapsed on September 22, 1994, uniformly dropping Blech Securities prices to levels which would have prevailed in the absence of the manipulative scheme.

The scheme was allegedly effected through a variety of deceptive devices, including sham transactions in which trades, which were reported on the NASDAQ system, took place at prearranged times and at prearranged prices. Certain of these purchases were made with the understanding that the same securities would be resold by the purchaser back to the seller or to another participant in the scheme. Other trades were arranged whereby Blech would supply the funds to the purchaser to be used to pay for the purchase. In still others, Blech Securities would be placed into accounts under Blech's control without the knowledge or authorization of the account holders. The manipulative scheme was also carried out by the gifting or sale of securities at nominal prices to fund managers with the understanding that they would cause their funds to purchase Blech Securities in the various offerings.

### II. The Allegations Against the Trustee Defendants

Plaintiffs allege that Madonia and Jofen were trustees of a number of charitable remainder trusts settled by Blech. They allege that Blech is the income beneficiary of all of the trusts, except for the Edward Blech Trust and the Blech Family Trust. Jofen is alleged to be Blech's cousin, and Madonia is alleged to have performed accounting services for Blech and/or Blech & Co. Compl. ¶ 28.

Plaintiffs allege that, although the trusts were nominally under the control of the "independent" trustees, Jofen and Madonia, the Blech Trusts were controlled by David Blech, who caused the trusts to purchase Blech Securities and to engage in sham transactions designed to artificially inflate and maintain the price of Blech Securities. Compl. ¶ 36.

Plaintiffs also allege that David Blech, through "the Blech Trusts," supplied money and/or securities to the individuals he had recruited into his scheme to pay for the securities purchased in the sham transactions. Blech would cause the Blech Trusts, or accounts under Blech's control, to wire into the accounts of these individuals cash or

securities to fill margin requirements to complete the "purchase." Compl. ¶ 66.

Blech would allegedly direct individuals to purchase securities at just above the composite bid price from Blech & Co. or Baird Patrick. Thereafter, Blech (or Baird Patrick) would then re-purchase the securities for settlement, sometimes using the Blech Trusts, so that the individuals directed to purchase the securities could pay for those securities on the settlement date with money received from the re-purchase by Blech & Co. or Baird Patrick. Compl. ¶ 68.

Blech also allegedly utilized the Blech Trusts which were ostensibly under the control of defendants Madonia and Jofen as trustees, but whose trading activity was actually controlled and directed by Blech, to engage in the buying and selling of tens of thousands of shares of Blech Securities to and from each other and other co-conspirators for the purpose of reporting large volumes of trading of these securities at inflated prices. Compl. ¶ 70.

As examples, Plaintiffs alleged that during the period from April 1994 through September 22, 1994, at David Blech's direction, Madonia caused several of the trusts under his control to engage in large volume trades involving a total of more than 16,220,000 shares, warrants or units of Blech Securities. Compl. ¶ 70.

The Complaint alleges that transactions involving the Blech Trusts had several variations. on some occasions Blech would use the Blech Trusts to be the purchaser in a sham transaction. On other occasions, the Blech Trusts were the "sellers" in certain arranged sales to confederates. Compl. ¶ 70. In some instances, the Complaint alleges, one Blech Trust would be the "buyer" of certain Blech Securities, while another would be the "seller." This would make the transaction appear legitimate, although the "buyer" would have already arranged to dispose of the security before the time of the purchase. Compl. ¶ 70.

The Blech Trusts also allegedly engaged in "free riding" when they "bought" huge amounts of Blech Securities without advancing any money toward their purchase price.

Thus, for example, a trust would "buy" tens of thousands of shares of Blech Securities without any cash or other liquid assets in its account, and would continue to hold it until the broker, through whom the purchase was made, demanded payment. At that time, the defendant Trustees of the Blech Trust would alert Blech of the need to "cover" the transaction. Blech would then cause the Blech Trust to close out the position, through, *inter alia*, arranged sales to confederates or to Blech & Co. or Baird Patrick. Compl. ¶ 70.

The Blech Trusts also allegedly acted as convenient locations for David Blech and Blech & Co. to "park" hundreds of thousands of shares of inflated Blech Securities by causing the Blech Trusts to buy those securities in transactions which were not *bona fide*, but undertaken with the understanding that the securities would be "sold" or the purchase transactions would be cancelled before the Blech Trusts would be required to pay. This conduct allegedly enabled Blech & Co. to give the appearance that it had met its net capital requirements, and served to inflate and maintain the price of Blech Securities. Compl. ¶ 71.

The Blech Trusts also allegedly transferred trust property directly to Blech for his own personal use and allowed certain lending institutions to use trust property as collateral for loans made personally to Blech. The Complaint provides two examples of such transactions, both of which involved Madonia's Trusts. Compl. ¶ 72.

### III. *Allegations Against Bear Stearns*

Plaintiffs assert that during the period from September 1993 through September 1994, Bear Stearns acted as a direct participant in the alleged manipulative scheme.

During the summer of 1994, Bear Stearns allegedly demanded that Blech & Co. sell Blech Securities in order to reduce its debt in margin accounts at Bear Stearns. Bear Stearns allegedly knew that the market prices of Blech Securities had to be maintained at artificially inflated levels in order for Blech to liquidate sufficient amounts of those securities to eliminate the debit balance outstanding at Bear Stearns and thereby eliminate Bear Stearns' own exposure to

the risk of incurring losses. The Complaint alleges that Bear Stearns knowingly executed manipulative sham transactions between David Blech and his affiliates and confederates. Compl. ¶ 38.

Bear Stearns allegedly knew that Blech and his affiliates had pledged large blocks of Blech Securities as collateral to lending banks, including Citibank, and that if the prices of the Blech Securities declined, the lending banks would seize the collateral and sell it on the market, thereby lowering the market price. Absent Blech's ability to borrow from the banks, based upon the value of his pledged collateral, Blech & Co. would be unable to meet margin calls in its own securities accounts, including its accounts at Bear Stearns. Compl. ¶ 38.

Plaintiffs contend that Bear Stearns was motivated to inflate the market prices for Blech Securities by its desire to decrease its own risk of loss due to Blech's mounting leverage and over concentration in small, illiquid biotechnology securities, many of which were classified by Bear Stearns as "not acceptable" as collateral due to their illiquidity and inflated price levels. Compl. ¶ 74.

Bear Stearns allegedly knew that the market prices of Blech Securities had to be maintained at artificially high levels in order for Blech to liquidate sufficient amounts of Blech Securities, thereby eliminating the debit balances outstanding in his accounts at Bear Stearns. Compl. ¶ 76.

As clearing agent for Blech & Co., Bear Stearns was allegedly in the position of (i) having access to confidential, non-public information concerning Blech & Co.'s financial condition, liquidity, and net capital position, (ii) having the power to extend or deny credit to Blech & Co. based upon the value of Blech Securities held as collateral, and (iii) having the power and control to determine whether or not to execute securities transactions on behalf of Blech & Co. and its clients. Compl. ¶ 73.

Bear Stearns allegedly "directed," "arranged" and "funded" the "contrived" sales and transfers of illiquid Blech Securities from Blech & Co. at artificially inflated prices to affiliated accounts so that these transactions appeared to the investing public to be the product of *bona fide* market demand and independent market forces. Compl. ¶¶ 85–86.

By June 8, 1994, when David Blech's aggregate debit balance on his margin accounts at Bear Stearns had risen to $15.9 million, Bear Stearns advised David Blech in writing that it intended to "entirely eliminate" the debit balance in David Blech's accounts over time and that, if Blech did not do so, Bear Stearns would have to consider whether it would continue its clearance relationship with Blech & Co. Thereafter, Bear Stearns allegedly demanded that Blech & Co. sell Blech Securities "at its direction." Compl. ¶ 75.

Bear Stearns' knowledge that it was executing unlawful manipulative transactions in Blech Securities allegedly derived from, among other things, (a) the close daily personal contact between Bear Stearns' upper management and Blech concerning the sale of Blech Securities to reduce the aforementioned debit balance, (b) the intimate knowledge of the market for Blech Securities gained by Bear Stearns' monitoring of Blech & Co.'s trading, (c) the scrutiny by Bear Stearns' margin department of the value and liquidity of Blech Securities to determine their eligibility for margin trading, and (d) Bear Stearns' daily analysis of key Blech & Co. accounts ("the parking accounts") which were allegedly used by Blech to transact manipulative trades in Blech Securities. Compl. ¶ 77.

During the summer of 1994, Bear Stearns' upper management allegedly warned Blech not to continue relying on unlawful parking transactions to solve his liquidity and net capital problems. Bear Sterns allegedly continued to engage in what it knew to be manipulative parking transactions after issuing these warnings. Compl. ¶ 82.

The Complaint alleges that on several days between July and September 1994, certain sham trades with one of Blech's affiliated parking confederates constituted the overwhelming majority of the trading volume in particular Blech Securities. During this same period, Bear Stearns (and its compliance officer) was allegedly closely monitoring Blech & Co. trades, because of its concerns

regarding Blech & Co.'s capitalization. It should have been readily apparent to Bear Stearns that the same account numbers appeared as purchasers in certain very large trades and as sellers in other such trades involving hundreds of thousands of shares of the same Blech Securities. Compl. ¶¶ 87–88.

On several occasions during the summer of 1994, David Blech allegedly did not cause enough cash and/or securities to be transferred into the bank accounts used by participants in the sham transactions. Because there was not enough money in the accounts to pay for the securities on the settlement date, the banks "D.K.'d" (i.e., declined to confirm and pay for) the securities, or the individual whose account was involved failed to affirm the trades. On several of the instances when this occurred, John Todona, a Bear Stearns representative, called the alleged participant to ask why the individual's bank had denied knowledge or refused to affirm the trades. Bear Stearns was then allegedly told to "speak to Blech." Compl. ¶¶ 90–91.

Plaintiffs contend that when Blech would become aware of a D.K.'d trade, presumably through Bear Stearns, he would contact the individual whose bank had D.K.'d the trade stating that he couldn't have any D.K.'s, and would then wire additional funds to complete the trades. Compl. ¶ 92.

The Complaint also alleges that Bear Stearns repeatedly executed sham parking transactions involving the purchase and sale of Blech Securities between David Blech and affiliated parking accounts which were maintained at Bear Stearns and which were under David Blech's control. Through the summer of 1994, Bear Stearns allegedly "directed" and "executed" sales of Blech Securities from Blech & Co. in sham transactions to the parking accounts. Compl. ¶¶ 80, 82.

The Complaint alleges that Bear Stearns executed numerous manipulative transactions between David Blech or Blech & Co. and parking accounts involving the common stock of Ecogen in the absence of *bona fide* market demand, despite Bear Steam's alleged knowledge that Blech was trading with parking accounts. Compl. ¶ 81–82.

When Bear Stearns advised Blech in August and September 1994 that he must sell securities from his inventory in order to reduce his aggregate debit balance, Blech advised Bear Stearns to sell Blech Securities to what Bear Stearns allegedly knew to be parking accounts. Bear Stearns allegedly agreed to and did "execute" these trades. Compl. ¶ 82–83.

Plaintiffs also allege that on July 5, 1994, Bear Stearns "contrived and agreed" to fund the pre-planned sales of certain Blech Securities between Blech & Co. and certain Blech affiliates, using the margin made available by Bear Stearns. Compl. ¶ 85. Although Bear Stearns allegedly knew that these pre-arranged transactions were between Blech and affiliates and nominees of Blech, Bear Stearns executed and reported the purchases and sales. Compl. ¶ 86.

### Discussion

### I. Legal Standards

In reviewing a motion to dismiss under Rule 9(b) or Rule 12(b)(6), a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). The inferences drawn from the allegations in a complaint must be reasonable. *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### A. Rule 9(b): Pleading Fraud With Particularity

■ Federal Rule of Civil Procedure 9(b) requires that in all allegations of fraud the circumstances constituting fraud must be stated with particularity. *See Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994). The concerns animating Rule 9(b) are "(1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits." *Blech I*, 928 F.Supp. at 1288, citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987).

■ As this Court noted in its previous opinion in this case, not all elements of fraud need be plead with equal particularity. *Blech I*, 928 F.Supp. at 1288. For example, allegations of scienter are not subjected to the same exacting scrutiny applied to the other components of fraud, such as direct participation. *Id.*, quoting *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 143 (2d Cir.1991). Scienter can be alleged by conclusory allegations if they are supported by facts giving rise to a strong inference of fraudulent intent. *Id.*, quoting *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir.1993).

■ This Court also noted that in a complaint alleging market manipulation under Section 10(b), where the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation. *Id.* at 1291. The Complaint must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.*

■ When, as in this case, a complaint is made against multiple defendants, "the pleading must give notice to *each* defendant of its alleged misconduct." *Id.* at 1292 (emphasis added). This requirement exists because each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged. *Id.* at 1292–93, quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 584 (S.D.N.Y.1995). Without this requirement, the policies of giving fair notice to, and protecting the reputation of, each defendant would be frustrated—parties might be improperly swept into the discovery stage of a litigation with other parties against whom fraud has been properly alleged. As a result, Rule 9(b) is not satisfied by a complaint in which "defendants are clumped together in vague allegations." *Id.* at 1294, quoting *Three Crown Ltd. Partnership v.*

*Caxton Corp.*, 817 F.Supp. 1033, 1040 (S.D.N.Y.1993).

**B. *Rule 12(b)(6): Failure to State a Claim***

A motion for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) should not be granted "unless it appears that plaintiff can prove no set of facts that would entitle him to relief." *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990). "The court's function on a Rule 12(b)(6) motion is not to weigh evidence ... but merely to determine whether the complaint itself is legally sufficient." *Connolly v. Havens*, 763 F.Supp. 6, 9 (S.D.N.Y.1991), quoting *Festa v. Local 3 International Brotherhood of Electrical Workers*, 905 F.2d 35, 37 (2d Cir.1990).

■ To state a claim under Section 10(b) and Rule 10b–5, plaintiffs must allege that in connection with the purchase or sale of securities, each defendant, acting with scienter, made a material false representation, or omitted to disclose material information, or engaged in a scheme to defraud, and that plaintiff's reliance on defendant's action caused plaintiff's injury. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985).

■ A market manipulation claim, as that alleged here, focuses on the "engaged in a scheme to defraud" aspect of Section 10(b) and Rule 10b–5 and was described by the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In that case, the Supreme Court defined market manipulation as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id.* at 199, 96 S.Ct. at 1384. Thus, in order to survive a Rule 12(b)(6) motion, a plaintiff asserting a market manipulation claim must allege direct participation in a scheme to manipulate the market for securities. *Connolly*, 763 F.Supp. at 10 (stating that a claim under Section 10(b) and Rule 10b–5 is not proper where there is no allegation of direct violation).

## II. *The Claims of Market Manipulation Under Section 10(b) and Rule 10b–5 Against Jofen Will Be Dismissed for Failure To Plead Fraud With Particularity*

▮ Plaintiffs contend that Jofen, as Trustee of the Edward Blech Trust, in concert with and under the influence of David Blech, participated in an unlawful scheme of buying and selling tens of thousands of shares of Blech Securities to and from the several alleged co-conspirators to the scheme for the purpose of reporting large volumes of trading in these securities at inflated prices. The Second Amended Complaint properly alleges that Jofen controlled the Edward Blech Trust, and alleges the nature, purpose, and effect of the fraudulent conduct by "the Blech Trusts."

However, on the facts presented in the Complaint, Plaintiffs have failed to meet their Rule 9(b) burden with respect to the allegations against Jofen. Plaintiffs have pleaded no facts linking Jofen directly to any individual "fraudulent" trades on behalf of the Edward Blech Trust and in furtherance of the alleged scheme.

The Complaint also fails to allege any particular facts indicating the direct participation of Jofen, or the trust of which he was the trustee (as distinct from the other Blech Trusts), in the scheme to defraud. Such direct participation constitutes a critical element of a Section 10(b) claim. *See Connolly,* 763 F.Supp. at 10.

As a result, while the Complaint corrects some of the Rule 9(b) infirmities present in the First Amended Complaint, it fails to distinguish, as it must, Jofen and the Edward Blech Trust from those trusts controlled by Madonia. Therefore, it cannot be deemed to have given Jofen fair notice of the claims against him. By lumping together the various allegations against the "Blech Trusts," the Complaint does not fulfill the Rule 9(b) policy of safeguarding Jofen's reputation from the stain of allegations leveled with particularity against other parties. *See Three Crown Ltd. Partnership,* 817 F.Supp. at 1040.

The complaint against Jofen will be dismissed for failure to plead fraud with particularity. It will not, however, be dismissed with prejudice as urged by Jofen because repleading against Jofen may not be futile. *See In re American Express Co. Shareholder Litigation,* 39 F.3d 395, 402 (2d Cir.1994) (stating that under Federal Rule of Civil Procedure 15(a), a court should refuse repleading if it would be futile). The allegations against Jofen fail because they are improperly commingled with the allegations against Madonia. It may be possible to reformulate the Complaint so as to fulfill the policies of Rule 9(b) as they relate to Jofen; therefore, plaintiffs will be permitted to replead the allegations against Jofen.

## III. *Madonia's Motions To Dismiss For Failure To Plead Fraud With Particularity And For Failure To State A Claim Will Be Denied*

### A. *The Complaint Against Madonia Properly Alleges Particular Acts of Direct Participation and Also Scienter*

The Second Amended Complaint, as it relates to Madonia, does not suffer from the same problems that plague the complaint against Jofen. While the trust controlled by Jofen and those controlled by Madonia are included in general references to the "Blech Trusts" in some of paragraphs of the Complaint, the Complaint does set forth particular acts of the Madonia trusts that indicate direct participation in a scheme to manipulate the price of the Blech securities. These allegations against Madonia are not merely "lumped" together with the general allegations against the "Blech Trusts," and thus the policy concerns that counsel dismissal of the claims against Jofen do not apply to Madonia.

▮ The Complaint also adequately alleges scienter with respect to Madonia. A strong inference of scienter can be established by showing conscious misbehavior or recklessness on the part of a defendant. *See Shields,* 25 F.3d at 1128. Plaintiffs allege that Madonia was the trustee of nine Trusts related to David Blech and that Madonia used these trusts to commit fraudulent acts

in concert with and under the direction of Blech. The Complaint alleges numerous sham transactions of Blech securities between Blech and the Madonia Trusts. The Complaint alleges that Madonia "authorized" these transactions on behalf of the Trusts. Given Madonia's relationship with Blech and the nature of the sham transactions (which were often between two trusts or occurred without ultimate payment by the trusts), conscious misbehavior on the part of Madonia may be inferred.

As a result, the Complaint pleads Madonia's scienter and participation in a market manipulation scheme with sufficient particularity. It gives adequate notice to Madonia, as Trustee of the Blech Trusts, of the claims against him and adequately delineates his particular alleged acts of fraud. The policies of Rule 9(b) are therefore satisfied, and Madonia's motion to dismiss for failure to plead fraud with particularity will be denied.

### B. *The Complaint States A Claim Against Madonia Under Section 10(b) and Rule 10b–5*

█ To state a claim for market manipulation under Section 10(b) and Rule 10b–5, Plaintiffs must allege that they suffered damage, in connection with the purchase or sale of securities, by relying on a scheme to defraud, engaged in by the defendants with scienter. *Connolly*, 763 F.Supp. at 10. As stated above, the Complaint adequately alleges the Madonia Trusts' participation in and scienter with respect to the alleged market manipulation scheme.

█ To fully state a claim for relief, Plaintiffs must also allege reliance and causation of damages. The Complaint alleges that the Plaintiffs acted in reliance on the integrity of the market for the Blech securities and that had they known of the allegedly fraudulent trades, including the trades involving the trusts, they would not have made their purchases.

The Complaint also alleges that Madonia's actions, in concert with those of David Blech, artificially raised the prices of, and maintained the market for, the Blech securities. Plaintiffs were injured when, after having purchased the securities under these conditions, the alleged scheme collapsed on September 22, 1994, causing the price of the Blech securities to fall.

Accordingly, the Complaint properly states a claim under section 10(b), and therefore defendant Madonia's motion to dismiss under Rule 12(b)(6) will be denied.

### IV. *Bear Stearns' Motion to Dismiss Will Be Granted in Part and Denied in Part*

As stated above, section 10(b) and Rule 10b–5 impose primary liability upon those persons or entities who employ manipulative and deceptive practices while engaged in a scheme to defraud. To state a claim for market manipulation, Plaintiffs must allege that (1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter. *Ernst & Ernst*, 425 U.S. at 199, 96 S.Ct. at 1383–84; *Connolly*, 763 F.Supp. at 10.

In their Amended Complaint, Plaintiffs have sufficiently alleged, under both Rule 12(b)(6) and Rule 9(b), that Bear Stearns directly and knowingly participated in deceptive or manipulative conduct that caused damage to the Plaintiffs. As a result, Bear Stearns' motion to dismiss the section 10(b) and Rule 10b–5 claims against it will be denied.

### A. *Plaintiffs Properly Allege Scienter As Well As Deceptive and Manipulative Conduct Under Section 10(b)*

#### 1. *Scienter*

As stated above, a plaintiff may establish an inference of scienter by identifying circumstances indicating conscious or reckless behavior by the defendant or by alleging facts showing a motive for, and an opportunity to engage in, the fraud. *Blech I*, 928 F.Supp. at 1288.

█ Plaintiffs have remedied the defects of their previous complaint by adding sufficient allegations to give rise to an inference

that Bear Stearns had actual knowledge of Blech's fraudulent conduct as well as a motive and opportunity for engaging in the scheme with Blech and his confederates. For example, Plaintiffs allege that, in its capacity as clearing broker, Bear Stearns had knowledge of the manipulative scheme through (1) close daily contact with David Blech; (2) an intimate knowledge of the market for the Blech securities and the value and liquidity of those securities and; (3) information from daily analysis of key Blech accounts through which the alleged sham transactions were executed. Compl. ¶ 77. They also allege that in the summer of 1994, Bear Stearns warned Blech that he should engage in "no more parking" of Blech securities, which demonstrates that Bear Stearns was aware of Blech's previously manipulative conduct and gives rise to an inference that Bear Stearns knew or should have known that subsequent transactions were likely to be fraudulent. Compl. ¶ 82.

Furthermore, Plaintiffs allege that Bear Stearns was motivated to raise and maintain the price of the Blech securities artificially for two reasons: to decrease its own risk of loss because the margin loans it extended Blech were collateralized by the Blech securities, and to eliminate the debit balances outstanding in Blech's accounts at Bear Stearns. Compl. ¶¶ 74, 76. Plaintiffs also allege that Bear Stearns had the opportunity to participate in the scheme because it was the clearing broker (*i.e.*, it processed the trades initiated by Blech and his confederates) and because, as a lender, it could deny or extend margin credit to Blech, thus influencing Blech's fraudulent trading activities. Compl. ¶¶ 73, 85–87.

These new allegations are sufficient at this juncture to satisfy the scienter requirement of a Section 10(b) claim.

### 2. *Manipulative and Deceptive Conduct*

 This Court also held that in order to state a claim against Bear Stearns, Plaintiffs must allege "that Bear Stearns *caused* or *directed* trading by Blech & Co.'s customers or *solicited* or *induced* them to buy Blech Securities at inflated prices." *Blech I,* 928

F.Supp. at 1295 (emphasis added). In other words, in addition to alleging scienter of the Blech scheme, Plaintiffs must also allege that Bear Stearns itself engaged in the kind of manipulative conduct that Section 10(b) prohibits in this context.

A number of the Complaint's allegations of fraudulent conduct are conclusory and therefore insufficient under Rule 9(b). However, the Complaint does contain certain allegations that, when read most favorably to the Plaintiffs, indicate that Bear Stearns caused Blech or his confederates to fraudulently trade, and that Bear Stearns *itself* engaged in conduct aimed at artificially inflating or maintaining the price of the Blech securities. These allegations, at this stage, are sufficient.

Bear Stearns contends that the conduct alleged by Plaintiffs amounts to no more than aiding and abetting the scheme of Blech and his confederates. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that, in a private action, secondary actors can not be held liable for aiding and abetting a securities fraud under Section 10(b). However, the Court in *Central Bank* stated:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity ... *who employs a manipulative device* or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability are met.

*Id.* 511 U.S. at 190, 114 S.Ct. at 1455 (emphasis added).

The question here is whether the conduct alleged against Bear Stearns constitutes the employment of a manipulative device under Section 10(b) and 10b–5. In other words, is Bear Stearns' alleged conduct no more than aiding and abetting, or has it crossed the line into primary liability?[5]

**5.** The Court of Appeals has provided some guid- ance on the fate of claims against "secondary"

Plaintiffs purport to have alleged sufficient facts to charge Bear Stearns with primary liability. However, in some instances, their allegations amount to no more than aiding and abetting. Even assuming that Bear Stearns had knowledge of the Blech scheme, primary liability cannot attach when the fraudulent conduct that is alleged is no more that the performance of routine clearing functions. In other words, under Section 10(b), the act of clearing sham trades is not equivalent to causing or directing sham trades for the purpose of soliciting or inducing a plaintiff to purchase securities. *See Blech I*, 928 F.Supp. at 1295. The act of clearing sham trades alone, even with scienter, is not enough to show an attempt to unlawfully affect the price of such securities within the meaning of Section 10(b). *Id.; see also, Dillon v. Militano*, 731 F.Supp. 634 (S.D.N.Y.1990) (dismissing a manipulation claim against a clearing broker because there was no allegation that the broker was making decisions regarding the introducing broker's client accounts); *Katz v. Financial Clearing & Servs. Corp.*, 794 F.Supp. 88, 94 (S.D.N.Y. 1992)

In certain portions of the Complaint, Plaintiffs characterize Bear Stearns' conduct as "engaging in," "executing," or "entering into" fraudulent trades. Such conclusory characterizations do not suffice when the factual allegations underlying those assertions are consistent with the normal activity of a clearing broker. *Blech I*, 928 F.Supp. at 1295. For example, Plaintiffs allege that in July and August of 1994, Bear Stearns "entered into" fraudulent trades of Ecogen stock. However, Plaintiffs' factual allegations make clear that what Bear Stearns "entered into" were transactions "between David Blech or Blech & Co. and the parking accounts." Compl. ¶ 81. In other words, Bear Stearns cleared trades initiated by Blech. Plaintiffs do not allege that Bear Stearns initiated the trades as a seller or by directing specific trades, but merely that it executed the trades at Blech's behest. Such allegations are insufficient to state a claim of primary liability. *See Faturik v. Woodmere Sec., Inc.*, 442 F.Supp. 943, 945 (S.D.N.Y. 1977) (dismissing direct liability claims under Section 10(b) against clearing broker who had "no part in initiating purchases and sales, but merely effected them at the behest of" the introducing broker.)

When Plaintiffs allege mere clearing conduct against Bear Stearns, such allegations amount to no more than a non-existent claim of aiding and abetting because, at most, they allege only that Bear Stearns knowingly and substantially assisted Blech by clearing the fraudulent trades. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994) (holding, in a case arising prior to *Central Bank*, that the elements of an action for aiding and abetting are (1) knowledge of the wrong; and (2) substantial assistance in the perpetration of the wrong).

However, the Complaint crosses the line dividing secondary liability from primary liability when it claims that Bear Stearns "directed" or "contrived" certain allegedly fraudulent trades. Under these circumstances, the Complaint adequately alleges that Bear Stearns engaged in conduct, with scienter, in an attempt to affect the price of the Blech securities. *Blech I*, 928 F.Supp. at 1295.

Plaintiffs allege that Bear Stearns "directed" Blech & Co. to sell Blech Securities by demanding that Blech reduce its debit balance with knowledge of Blech's history of sham trading, and that Blech, in response to Bear Stearns' pressure, engaged in manipulative parking transactions, which Bear Stearns cleared. This course of conduct by Bear Stearns—the instigation of trading that Bear Stearns knew or should have known would result in fraudulent trades that would

actors under Section 10(b) after *Central Bank*. In *In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255 (2d Cir.1994), the Second Circuit, citing *Central Bank*, declined to convert an aiding and abetting claim into a claim of primary liability in an insider-trading case alleging material omissions. *Id.* at 264. On the other hand, in *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir.

1996), the Court of Appeals stated that primary liability "may be imposed 'not only persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" *Id.* at 1471, *quoting Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994).

artificially inflate the price of the Blech Securities, and the subsequent clearing of the resultant fraudulent trades for its own pecuniary benefit—constitutes an attempt to affect the price of the Blech Securities. As a result, by participating at both the initiation and clearing stages of the allegedly fraudulent transactions, Bear Stearns knowingly engaged in a manipulative scheme to defraud under Section 10(b), which affected the market upon which Plaintiffs relied in purchasing the Blech Securities. The pressure exerted by Bear Stearns on Blech to reduce his debit balance, when combined with Bear Stearns' knowledge of Blech's sham trading and its clearing of such trades, does not "reflect ... the standard practice of [a] clearing broker." *Id.; compare Dillon,* 731 F. Supp at 636 (dismissing claims against a clearing broker was "merely performing back office functions").

Plaintiffs further properly allege manipulative conduct against Bear Stearns when they claim that on July 5, 1994, Bear Stearns, in an effort to sell and transfer certain Blech Securities, "contrived and agreed to fund" the pre-planned fraudulent sale of Blech Securities. Compl. ¶ 85. This allegation satisfies the conduct element of a Section 10(b) claim because Bear Stearns is alleged to have conceived of and participated in the initiation and clearing of sham transactions aimed at affecting the affecting the price of the Blech Securities.

These allegations stand on grounds different from those presented in *Ross v. Bolton,* 904 F.2d at 821. There, the plaintiffs were only alleging the conduct of a normal clearing broker that extends loans on margin to its clients. Here, however, it is alleged that Bear Stearns knowingly contrived and funded sham transactions. This allegation, assumed for purposes of this motion to be true, states a claim that Bear Stearns employed a manipulative device that suffices for the imposition of primary liability under *Central Bank.*

 Moreover, Plaintiffs have described Bear Stearns' conduct with sufficient particularity under Rule 9(b). Where, as here, the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by Rule 9(b) is somewhat relaxed. *Blech I,* 928 F.Supp. at 1290–91. Where a complaint alleges market manipulation under Section 10(b), more generalized allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation. *Id.* at 1291. Plaintiffs here have described the general nature of Bear Stearns' conduct (specifically, the pressure to sell shares and subsequent clearing of sales to known parking accounts and the "contrivance" and funding of pre-planned sales), identified the time the conduct occurred (July and August 1994), and explained how the conduct affected the price of securities. Although Plaintiffs have not identified the specific securities involved in all of these trades, the allegations are sufficient to satisfy the purposes of Rule 9(b): providing defendants with notice of the charges against them, protecting a defendant's reputation from harm from unfounded allegations, and reducing strike suits.

### 3. *Causation*

 Bear Stearns also contends that Plaintiffs have failed to satisfy the causation element of a primary Section 10(b) claim. In claims involving a broad-based scheme to defraud, such as that alleged here, a plaintiff must show both loss causation (*i.e.,* that the fraudulent conduct caused the economic harm) and transaction causation (*i.e.,* that the fraud caused the plaintiff to engage in the purchase or sale of the security). *See Bennett v. U.S. Trust Co.,,* 770 F.2d 308, 313 (2d Cir.1985).

Bear Stearns' primary argument with respect to transaction causation is that Plaintiffs have not pled facts showing that any plaintiff purchased any particular Blech securities after Bear Stearns' alleged misconduct. However, the pleadings do contain allegations that at least some of the plaintiffs purchased shares of various Blech securities after July 5, 1994, when Bear Stearns allegedly "contrived" and funded a preplanned sale of large volumes of Blech securities, and that a smaller number of plaintiffs purchased shares after August 23 and/or August 30, 1994, when Bear Stearns allegedly directed

Blech to sell securities and then executed the resulting sham trades.

 Moreover, there is a rebuttable presumption of transaction causation when a Rule 10b–5 plaintiff pleads under a "fraud on the market" theory, "which permits a plaintiff to rely on the integrity of open, well-developed markets rather than requiring proof of direct reliance on a defendant's conduct." *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 748 (2d Cir.19 § 2). Bear Stearns argues that the presumption has been rebutted, because, Bear Stearns contends, its only conduct with respect to the fraudulent trades took place after the transacting parties placed their trades. However, as discussed above, Bear Stearns acted before the alleged fraudulent trades by exerting pressure on Blech to initiate them or by "contriving" the trades itself. Moreover, the fact that Bear Stearns' actions with respect to the fraudulent trades between Blech and his confederates (as opposed to the trades involving the plaintiffs) took place "after" the fraudulent trades is irrelevant. What matters is whether the Plaintiffs purchased in reliance on the presumption that the securities were trading on an open market, when in fact Bear Stearns' conduct had manipulated that market before the Plaintiffs made their purchases. It appears from the pleadings that at least some of the Plaintiffs purchased their securities after the manipulative conduct of Bear Stearns had contributed to the skewed market for Blech securities. Accordingly, Plaintiffs have adequately alleged transaction causation.

With respect to loss causation, the principal question is whether the loss is a reasonably foreseeable consequence of the fraudulent actions. *Thornock v. Kinderhill Corp.,* 712 F.Supp. 1123, 1127 (S.D.N.Y.1989). Here, the economic harm to the Plaintiffs from the ultimate collapse of the price of the Blech securities that were inflated by the actions of Bear Stearns (and Blech and his confederates) was a foreseeable consequence of Bear Stearns' alleged conduct. Accordingly, loss causation is also adequately pleaded.

For the foregoing reasons, Bear Stearns' motion to dismiss the Section 10(b) and Rule 10b–5 claims against it will be denied.

**B. *Plaintiffs Have Failed To State A Claim For Control Person Liability Under Section 20(a) of the Exchange Act Against Bear Stearns***

 Section 20(a) of the Exchange Act imposes joint and several liability on any person who "controls any person liable under any provision of this title or of any rule or regulation thereunder." 15 U.S.C. § 78t(a) (1995). To make out a *prima facie* case for control person liability, "a plaintiff must show a primary violation by the controlled person ... control of the primary violator by the targeted defendant ... and ... that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *S.E.C. v. First Jersey Securities,* 101 F.3d 1450, 1472 (2d Cir.1996) (citations omitted). Furthermore, "control over a primary violator may be established by showing that [the controller] possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Id.,* quoting 17 C.F.R. § 240.12b–2. Plaintiffs allege control person liability against Bear Stearns in two instances: first, with respect to its control over its employee John Todona, and second with respect to control over Blech & Co. itself. The allegations with respect to both are insufficient.

First, as to Todona, Plaintiffs have not alleged that Todona engaged in any acts of fraud actionable under the securities laws. As with some of the allegations against Bear Stearns, Plaintiffs have established at most that Todona knew of the Blech scheme; there are, as in the previous complaint, no allegations of fraudulent conduct made against Todona. Therefore Bear Stearns can not be liable as a control person. *See, e.g., Moss v. Morgan Stanley,* 719 F.2d 5, 16–17 (2d Cir.1983).

 Second, as to Blech & Co., the Complaint makes no allegations that Bear Stearns controlled the actions of Blech. Actual control is essential to control person liability. *See Ross v. Bolton,* 83 Civ. 8244, 1989 WL 80428, at *2 (S.D.N.Y. Apr.4, 1989)

(defendant must possess actual control over the transactions in question). The lower court decision in *Ross* held that even if a clearing broker affects the actions of an introducing broker, such action is not the same as directing those actions. *Id.* at *4. Bear Stearns, it is alleged, influenced Blech by telling him that his margin debt was too high and that he should sell securities to reduce the debt. See Compl. ¶ 82. While this exercise of influence over Blech, when coupled with the knowing execution of the resulting fraudulent transactions, is sufficient for primary liability to attach, such an exercise of influence is not "actual control." Bear Stearns did not have the power to direct or cause the direction of the management and policies of Blech & Co. through the ownership of voting securities, by contract, or in any other direct way. As a result, the claims against Bear Stearns for control person liability with respect to Blech & Co. and John Todona will be dismissed.

## V. *The Common Law Fraud Claims*

 The common law fraud claims against Bear Stearns and Madonia will not be dismissed. As discussed above, Plaintiffs have adequately alleged these parties' direct and knowing participation in a market manipulation scheme that injured the Plaintiffs. These allegations are also sufficient to state a fraud claim under the New York common law. *See Minpeco, S.A. v. Conticommodity Services, Inc.,* 552 F.Supp. 332, 336–337 (S.D.N.Y.1982) (finding that effort to artificially raise price of silver amounted to creation of "price mirage" actionable as common law fraud).

Defendants also argue, once again, that transaction causation is lacking, and that the fraud on the market theory is not available to satisfy the reliance element in a common law fraud claim. It is true that a fraud on the market theory is not available in cases alleging misrepresentations or omissions. *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1221 (S.D.N.Y.1994), aff'd, 57 F.3d 146 (2d Cir.1995). However, in the context of market manipulation, New York law requires only that a plaintiff allege reliance on the integrity of the market to satisfy the reliance element of common law fraud.

*Minpeco, S.A. v. Hunt,* 718 F.Supp. 168, 176 (S.D.N.Y.1989); *see also Schultz v. Commercial Programming Unlimited, Inc.,* No. 91 Civ. 7924, 1992 WL 396434, *3 (S.D.N.Y. Dec.23, 1992) (explaining *Minpeco* ). Accordingly, the common law fraud claims against Bear Stearns and Madonia will not be dismissed.

The common law claims against Jofen will be dismissed for failure to plead fraud with sufficient particularity, as described above.

### Conclusion

For the reasons set forth above:

1. Mordechai Jofen's motion to dismiss for failure to plead fraud with particularity is hereby granted in its entirety, with leave to replead within twenty (20) days.

2. Nicholas Madonia's motion to dismiss is hereby denied.

3. Bear Stearns' motion to dismiss is hereby denied with respect to the Section 10(b) and common law fraud claims and granted with respect to the Section 20(a) control person liability claims.

It is so ordered.