In re STERLING FOSTER & CO., INC. SECURITIES LITIGATION,

This Document Relates To:

Joe L. Price, Plaintiff,

v.

Sterling Foster & Company, Inc. Frank Monroig, Timothy J. Matthews, Athannasios Dogantzis, and Jason John Marowski, Defendants.

MDL Docket No. 1208 (ADS)(MLO). No. 98 CV 1470(ADS).

United States District Court, E.D. New York.

June 27, 2002.

Stephens & Stephens by R. Gary Stephens, Esq., Houston, TX, for Plaintiff.

Ungaretti & Harris by Miriam G. Bahcall, Esq., Chicago, IL, for Defendants Sterling Foster & Company, Inc., Adam R. Lieberman, Frank Monroig, Timothy J. Matthews, and Jason John Marowski.

Covington & Burling by P. Benjamin Duke, Esq., New York City, for Defendant Bear, Stearns Securities Corp.

Athannasios Dogantzis, Defendant Pro Se, no appearance.

## ORDER

SPATT, District Judge.

The complaint arises out of claims by the Joe L. Price ("Price" or the "plaintiff") that Sterling Foster & Company, Inc. ("Sterling Foster"), Adam R. Lieberman ("Lieberman"), Frank Monroig ("Monroig"), Timothy J. Matthews ("Matthews"), Jason John Marowski ("Marowski") (collectively, the "Sterling Foster Defendants"), Athannasios Dogantzis ("Dogantzis"), and Bear Stearns Securities Corp. ("BSSC") (collectively, the "defendants") violated the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(a)(2); the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962; the Texas Securities Act; the Texas Business and Commerce Code; and the Texas Deceptive Trade Practices Act. This action also alleges common law claims for fraud and breach of contract. Presently before the Court are motions by the Sterling Foster Defendants and BSSC to stay, transfer, and/or dismiss the complaint.

## I. BACKGROUND

### A. The Procedural Nature of the Case

Price commenced this case on August 5, 1997, by filing a complaint in the United States District Court for the Eastern District of Texas, Texarcana Division. On October 9, 1997, an unexecuted return of service for Dogantzis was filed with the Court. Dogantzis has not appeared in this action. On November 26, 1997, the Sterling Foster Defendants filed a motion to stay, transfer or dismiss the action; on December 17, 1997, Price filed his opposition papers; and on January 5, 1998, the Sterling Foster Defendants filed their reply papers.

On January 5, 1998, BSSC filed a motion to stay or dismiss the action; and on February 17, 1998, Price filed his opposition papers.

One day later, on February 18, 1998, the Judicial Panel on Multidistrict Litigation ("J.P.M.L.") granted a motion by Sterling Foster to centralize a number of actions, including the present one, pursuant to 28 U.S.C. § 1407 for coordinated and consolidated pretrial proceedings in the Eastern District of New York. The J.P.M.L. also transferred the cases to the Eastern District of New York and assigned the Multidistrict Litigation to this Court. Therefore, when the present case was assigned to this Court, the motions by the Sterling Foster Defendants and BSSC were pending. On March 12, 1998, BSSC filed with this Court its reply papers in support of its motion to stay or dismiss the action.

### B. The Complaint

The following facts are taken from the complaint. In March 1995, Price opened an account with Sterling Foster. Lieberman was Sterling Foster's President and a registered General Securities Principal. Monroig, Matthews, and Marowski were Sterling Foster employees and/or officers and were General Securities Principals and Representatives with Sterling Foster. Although the complaint does not specifically describe Dogantzis' role at Sterling Foster, it appears from the allegations contained therein that Dogantzis was a broker. The complaint alleges that Lieberman, Monroig, Matthews, Dogantzis, and Marowski participated in deceptive trade practices and fraudulent and manipulative sales practices. The complaint further asserts that Sterling Foster representatives and

employees made numerous misrepresentations to Price in order to persuade him to purchase stock; omitted material facts when they sold stock to him; misled Price in regard to all aspects of Sterling Foster's firm, business and the methods they used to buy and sell securities (complaint ¶¶ 16–19).

On a date that is not specified in the complaint, a representative from Sterling Foster sold Price $528,161 of common stock in Embryo Development Corporation ("Embryo"). Monroig instructed Sterling Foster employees to tell clients that Sterling Foster would honor stop loss orders because they were "good selling points" (complaint ¶ 14). Price sent Sterling Foster a letter via certified mail instructing Sterling Foster to sell the stock when it dropped to a certain price.

Dogantzis received Price's letter and asked Monroig what steps he should take. Monroig rolled his eyes and said, " 'Oh don't worry, just let the traders run it, we'll worry about it later' " (complaint ¶ 14). Sterling Foster did not honor Price's stop loss order causing him to suffer financial losses in excess of $219,435.

When Price asked Dogantzis why Sterling Foster had not honored his stop-loss order, Doganzis replied that if he had executed the order and, thus, sold Price's shares, the stock would have "tank[ed]" (complaint ¶ 14). On March 19, 1996, Price asked Matthews why Sterling Foster had not executed his stop-loss order. Matthews explained that even with the stop-loss order, he needed Price's consent to sell, and Price was unavailable to give his consent. On December 18, 1996, Monroig told Price that if Sterling Foster had executed the "stop-loss" order, the stock may have declined somewhat in value. Monroig maintained that, ultimately, the price of the stock would have risen, and Price would have been angry and disappointed that Sterling Foster had executed the stop-loss order.

After Price lost money as a result of investing through Sterling Foster, its employees and representatives offered him "hot deals" purported to help him recover his losses. On April 26, 1996, Matthews said that he would infuse Price's account with capital as early as the following week in order to compensate him for the losses he incurred from selling the Embryo stock.

On June 14, 1996, Monroig told Price that Sterling Foster could make him $525,000 in approximately four-to-six months. Later in the conversation, Monroig said that he would make Price the sum of $100,000 in thirty days as a showing of good faith. Monroig also stated that if Sterling Foster failed to make $200,000 for Price in sixty days, then Price could file a lawsuit. Monroig summed up his position by stating, " 'You know, I mean, you give us the opportunity to take care of what we need to take care of on our end, if, if we can't take care of it, you can litigate the case' " (complaint ¶ 20).

Various Sterling Foster employees and representatives suggested to Price that Sterling Foster could manipulate the price of various stocks. On January 11, 1996, Matthews told Price that on January 22, 1996, he would purchase 160,000 shares of Embryo common stock for the sum of $1.6 for one of his accounts. Therefore, explained Matthews, he knew that " 'volume [was] coming into the stock' " (complaint ¶ 21). Price asked Matthews why he was waiting until January 22, 1996 to purchase the shares. Matthews replied that in order to establish a tax loss, he had to wait 30 days from the date he sold the stock to buy it back. Matthews also said that the client on whose behalf Price was purchasing the stock would have the money for the

purchase "freed up" on January 22, 1996 (complaint ¶ 21).

Matthews indicated to Price that Sterling Foster could " 'pre-arrange a profit in an IPO for Price' " by "cost averaging big blocks" of stock. Markowski told Price that instead of investing in an IPO, he would " 'get [Price] in an in and out situation. Meaning, we're gonna buy the stock when it opens up for public trading and we're going to have the stock out of your account by the end of the day ... Might be only two or three points ... but these guys are doing whatever they've gotta do to make me money' " (complaint ¶ 21).

Dogantzis told Price, on more than one occasion, that Sterling Foster controlled the market and could guarantee that the price of a stock would rise. In one conversation, Dogantzis said that two-and-one-half-to-three-million shares of the stock would be purchased the following day, driving the price of the shares up eleven or twelve dollars. Dogantzis also told Price that when Lieberman "needs a paycheck," he tells Monroig to instruct the Sterling Foster's 400 brokers to "aggressively recommend" shares in a particular company. Dogantzis also explained that when 400 brokers are recommending a single stock, the price of that stock rises three or four points.

On May 6, 1996, Dogantzis explained that Sterling Foster could manipulate the market in a stock by telling 300 of their brokers to buy 2 million shares of stock. Regardless of what the company does, Sterling Foster's massive purchasing results causes the price of the stock to rise. Once Sterling Foster stops buying the shares, there is no interest in the stock.

The complaint also alleges that the Sterling Foster Defendants and Dogantzis misrepresented the commissions, mark-ups, or mark-downs they were charging Price. Dogantzis told Price that Sterling Foster did not charge commissions but rather charged a markup or markdown on the stock (complaint ¶ 22).

Price further claims that the Sterling Foster Defendants and Dogantzis made purchases and sales in his account without his permission (complaint ¶ 23). After Sterling Foster made an unauthorized purchase of ML Direct stock on behalf of Price, he contacted Monroig to request an explanation for the purchase. Monroig said that, " 'maybe I did, in fact, contact you afterward. But ... you're a tough guy to get hold of ... So maybe the fact is, maybe I didn't contact you until a day or two after or a couple, or five days from what you're telling me' " (complaint ¶ 23).

After Matthews made an unauthorized purchase and sale in Price's account, he told Price, " 'I just wanted to try to get you as much money as I possibly could as far as a differential in any buys and sells that we had to do to make sure we could take care of your tax liability' " (complaint ¶ 23).

The complaint also alleges that Sterling Foster, Lieberman, Monroig, Mattews, Dogantzis, and Marowski failed to follow Price's instructions to sell stocks and liquidate positions; used manipulative trading practices; employed boiler room sales techniques; and conducted improper underwritings (complaint ¶¶ 24–26). It also alleges that Lieberman, Monroig, and Matthews failed to supervise the brokers handling Price's account and, in fact, instructed their brokers to make material misrepresentations. Price claims that the stocks Sterling Foster sold him were not registered for sale under the Texas Securities Act (complaint ¶ 15).

Price invested approximately $721,846 with the Sterling Foster Defendants and Dogantzis. He relied on the knowledge and expertise of Sterling Foster's employees and representatives to provide him

with reasonable investment services and, as a result, lost more than $325,082.

BSSC was Sterling Foster's clearing firm. In that position, BSSC carried all of Sterling Foster's trades on its books, and all of Price's cash payments were made to BSSC. As such, Price alleges that BSSC "played an integral part in the fraudulent sales practices" (complaint ¶ 32). Because Sterling Foster was manipulating the market for most of the securities in Price's account, there was no independent competitive market existed for those stocks. Accordingly, the only reliable basis for determining the prevailing market price of each of these stocks was the price Sterling Foster paid for them. As such, the valuations listed on BSSC's monthly statements were based on Sterling Foster's market manipulation and, thus, were unrealistic valuations. BSSC was aware that Sterling Foster was manipulating the prices of the stocks and that the valuations they were reporting were not reliable. Accordingly, Price alleges that BSSC assisted in, and benefitted from, Sterling Foster's fraudulent practices.

In addition, BSSC did not disclose material conflicts of interest to Price. Richard Harriton, the officer in charge of BSSC's clearing operations, was the father of one Matthew Harriton, who was Embryo's Chief Financial Officer. Price lost the approximate sum of $219,435 as a result of his investment in Embryo.

It appears that Prices raises nine claims for relief. The first claim alleges that the defendants violated Section 10(b) of the Exchange Act by employing manipulative and deceptive devices in connection with the purchase and sale of securities. Price also asserts that Lieberman, Monroig, and Matthews were "control persons" within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20 of the Exchange Act, 15 U.S.C. § 78t(a). As part of the same claim, Price alleges that Ster-

ling Foster, Lieberman, Monroig, Matthews, and BSSC are liable under the theory of respondeat superior.

In the second claim, Price alleges that the defendants violated Article 581-7 of the Texas Securities Act by selling him securities that were not registered for sale in Texas. The third claim alleges that the defendants violated Article 581-33 of the Texas Securities Act by selling securities by means of misrepresentations or omissions of material facts.

As fourth and fifth claims for relief, Price asserts common law fraud and breach of contract, respectively. In his sixth claim for relief, Price alleges statutory fraud under Texas Business and Commerce Code Sec. 27.01. As a seventh claim, Price alleges that the defendants violated four sections of the Texas Deceptive Trade Practices Act, *see* §§ 17.46(b)(2), (5), (7), (24), and as an eighth claim, Price contends that the defendants violated section 17.50(a)(3) of the same statute.

In his ninth claim, Price asserts civil RICO violations by the defendants under 18 U.S.C. § 1962.

## II. *DISCUSSION*

### A. The Motions to Stay or Transfer the Action

The motion filed by the Sterling Foster Defendants requests, among other things, that the Court: (1) stay the action pending the resolution of the "first-filed proceedings" in the Eastern District of New York; or (2) transfer the case to the Eastern District of New York. BSSC also moves for a stay of the proceedings pending resolution of the various actions previously filed in the Eastern District of New York. Since the defendants filed their motions, the J.P.M.L. transferred the case to this Court for coordinated pretrial proceedings

with the other actions in the Multidistrict Litigation. Accordingly, the motion by the Sterling Foster Defendants to stay or transfer the case and the motion by BSSC to stay the proceedings are denied as moot.

### B. The Motion by the Sterling Foster Defendants to Dismiss the Action for Lack of Personal Jurisdiction

Although the Sterling Foster Defendants cite to Rule 12(b)(6) in support of their motion to dismiss, one of the arguments in support of their motion is that the Eastern District of Texas lacked personal jurisdiction over them. The Court construes this phase of the Sterling Foster Defendants' motion as being brought pursuant to Rule 12(b)(2).

Personal jurisdiction over a nonresident defendant is governed by the law of the state in which a federal court sits. *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 119 (2d Cir.1967). However, in a multidistrict litigation, the transferee court must apply the law of the transferor forum in determining issues of personal jurisdiction. *See Van Dusen v. Barrack*, 376 U.S. 612, 639–40, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964); *In re Plumbing Fixtures Litig.*, 342 F.Supp. 756, 758 (Jud.Pan. Mult.Lit.1972). Indeed, in cases that are consolidated for pretrial purposes under 28 U.S.C. § 1407, a transferee court can exercise personal jurisdiction only to the same extent as the transferor court could. *In re Agent Orange Prod. Liability Litig.*, 818 F.2d 145, 163 (2d Cir.1987). Thus, in determining whether the Eastern District of Texas has personal jurisdiction over the Sterling Foster Defendants, this Court will apply the law of the state of Texas.

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if: (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) the exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution. *See Latshaw v. H.E. "Sonny" Johnston*, 167 F.3d 208, 211 (5th Cir.1999). Because the Texas long-arm statute confers jurisdiction to the limits of due process, *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex.1990); *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex.1977), "a nonresident's amenability to personal jurisdiction under the Texas long-arm statute collapses into a federal-style inquiry as to whether jurisdiction comports with federal constitutional guarantees." *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir.1990).

Personal jurisdiction over a nonresident will not violate due process principles if two requirements are met. First, the nonresident must have purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts with that forum state such that the defendant could reasonably anticipate being haled into court there." *See International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir.2001); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir.1999). Second, the exercise of personal jurisdiction over the non-resident must not offend traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *Lewis*, 252 F.3d at 358; *Wien*, 195 F.3d at 211. The minimum contacts element is further subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. *See Lewis*, 252 F.3d at 358. Specific jurisdiction exists when the nonresident defendant's contacts

with the forum state arise from, or are directly related to, the cause of action. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir.1994) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984)). On the other hand, general jurisdiction attaches when the defendant's contacts with the forum state are unrelated to the cause of action but are "continuous and systematic." *Wilson*, 20 F.3d at 647 (citing *Helicopteros*, 466 U.S. at 414 n. 9, 104 S.Ct. at 1872 n. 9); *see Lewis*, 252 F.3d at 358.

■■■■■ "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir.1985). When the district court rules on the motion without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper. *See Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir.1985). "Moreover, on a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Bullion*, 895 F.2d at 217.

■■■ The complaint alleges that Matthews, Monroig, and Doganztis each had conversations with Price regarding purchasing stock through Sterling Foster. In particular, the three Sterling Foster representatives explained why Sterling Foster failed to execute Price's stop-loss order. In addition, after Price lost money from investing in Embryo, Matthews offered in "hot deals" to help him recover his losses. Marowksi also told Price that he could make back the money Price lost by getting him "in an in and out situation." Monroig promised to make back the money Price lost within four-to-six months. Matthews and Dogantzis told Price that Sterling Foster could manipulate the price of certain securities. Following unauthorized purchases and sales on Price's account Monroig admitted that he might not have contacted Price until after the transaction, and Matthews explained that he was simply trying to make as much money for Price as possible.

The complaint does not specify where these conversations occurred. However, given that Price is domiciled in Texas while Sterling Foster and its representatives are domiciled in New York, it is reasonable to infer that these were telephone conversations. Further, the complaint alleges that Sterling Foster representatives used "boiler room" sales tactics, which generally means that they cold-called prospective customers and employed high pressure sales tactics to persuade them to purchase stock. Moreover, nothing in the defendants' papers suggests that the conversations described in the complaint did not occur on the telephone.

■■■ The Court finds that these conversations are sufficient evidence of minimum contacts to justify personal jurisdiction. "A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis*, 252 F.3d at 358–59 (citing *Brown v. Flowers Indus.*, 688 F.2d 328, 332–33 (5th Cir.1982)). The conversations regarding the stop-loss order; the deals Sterling Foster would offer to help him recover his losses; Sterling Foster's ability to manipulate the market; and the unauthorized activity in Price's account cannot be viewed as "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480, 105 S.Ct. 2174, 85

L.Ed.2d 528 (1985). Rather, these telephone calls with the plaintiff in Texas form the very basis of his complaint. "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien,* 195 F.3d at 213. The actual content of the conversations Price had with Monroig, Matthews, and Marowski demonstrates that those individual defendants and Sterling Foster availed themselves of "the privilege of causing a consequence in Texas." *Id.; see also Lewis,* 252 F.3d at 359 (holding that a single telephone call with plaintiff in Texas and one contract sent to Texas, both of which contained material omissions that form the basis of the cause of action, are sufficient to establish minimum contacts). Accordingly, the Court finds that the complaint alleges that Monroig, Matthews, Marowski, and Sterling Foster had sufficient contacts with Texas to satisfy the minimum contacts prong of the personal jurisdiction inquiry.

 Notably, however, the complaint does not allege that Lieberman had any contact with Texas. Further, personal jurisdiction over Lieberman cannot be obtained simply by reason of the fact that the Court has personal jurisdiction over Sterling Foster. *See Stuart,* 772 F.2d at 1198. Although some "courts have recognized an exception to this rule when the corporation is the alter ego of the individual," *see Stuart,* 772 F.2d at 1198, the complaint contains no such allegations. Because the complaint does not allege that Lieberman had a single contact with the State of Texas, the Eastern District of Texas lacks personal jurisdiction over him, and the complaint against him is dismissed.

In regard to the remaining Sterling Foster Defendants, the Court finds that the exercise of personal jurisdiction over them will not offend traditional notions of fair play and substantial justice. *See Lewis,*

252 F.3d at 359. Indeed, "Texas has a significant interest in providing a forum for this action because the injured party, [Price], is a Texas resident." *Id.* (citing *Wien Air,* 195 F.3d at 215; *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 779–80 (5th Cir.1986)).

## C. The Motions to Dismiss the Complaint

 The Sterling Foster Defendants and BSSC move, in the alternative, to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."). On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. *See King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (holding that dismissal is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *See Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. *See Villager Pond,* 56 F.3d at 378. The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 127 (2d Cir.1999); *Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998).

 In making this determination, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999); *see Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000) (holding that for the purpose of deciding a motion to dismiss, the complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999). The Court also may consider documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *Rothman*, 220 F.3d at 97; *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991). Further, in securities fraud actions, the Court may consider "public disclosure documents required by law to be and which actually have been filed with the SEC." *Rothman*, 220 F.3d at 89 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 808–09 (2d Cir.1996).

### 1. The Claim Pursuant to Rule 10(b) of the Exchange Act

Price's claim for securities fraud under Section 10(b) is based on two theories: (1) material misrepresentation; and (2) market manipulation. Accordingly, the Court's analysis of the Sterling Foster Defendants' motion to dismiss the claim addresses both of the theories upon which it are based. The Sterling Foster Defendants move to dismiss the claim brought pursuant to Rule 10(b) of the Exchange Act on the grounds that: (1) it is not pled with the particularity required by Rule 9(b); and (2) the Eastern District of Texas

does not have personal jurisdiction over Lieberman, Monroig, Matthews, or Marowski. BSSC moves to dismiss the same claim on the ground that the complaint fails to allege that: (1) BSSC made a material misrepresentation; (2) Price relied on representations made by BSSC in purchasing securities; or (3) scienter on the part of BSSC.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibit fraudulent activities in connection with securities transactions. Section 10(b) makes it "unlawful for any person . . . [t]o use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [Securities and Exchange Commission Rules.]" 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the Securities and Exchange Commission under Section 10(b), prohibits any person from, among other things, "mak[ing] any untrue statement of material fact or . . . omit[ting] . . . a material fact necessary in order to make the statements made, not misleading." 17 C.F.R. § 240.10b–5(b). Rule 10b–5 also prohibits the employment of "any device, scheme or artifice to defraud." 17 C.F.R. § 240.10b–5(a).

 To state a claim under Section 10(b) and Rule 10b–5 based on a material omission or misrepresentation, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996) (citing *In re Time Warner Inc. Secs., Litig.*, 9 F.3d 259, 264 (2d Cir.1993)); *see Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). To state a claim under Section 10(b) and Rule 10b–5 against persons who

employ manipulative and deceptive trade practices in a scheme to defraud, a plaintiff must allege: (1) that he was injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendants' deceptive and manipulative conduct; and (5) defendants engaged in the manipulative conduct with scienter. *In re Blech Sec. Litig.*, 961 F.Supp. 569, 582 (S.D.N.Y.1997) (*Blech II*) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383–84, 47 L.Ed.2d 668 (1976)); *see Vandenberg v. Adler*, No. 98 Civ. 3544, 2000 WL 342718, *7 (S.D.N.Y. March 31, 2000); *see also Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir.1989); *Connolly v. Havens*, 763 F.Supp. 6, 10 (S.D.N.Y.1991).

A complaint asserting securities fraud generally must satisfy the heightened pleading requirement of Rule 9(b) of the Fed.R.Civ.P., which requires fraud to be alleged with particularity. *Kalnit*, 264 F.3d at 138; *Ganino*, 228 F.3d at 168; *see* Fed.R.Civ.P. 9(b). Rule 9(b) requires that "[i]n all averments of fraud . . ., the circumstances constituting the fraud shall be stated with particularity." Fed.R.Civ.P. 9(b). Thus, a securities fraud allegations based on a material misrepresentation or omission shall " '(1) specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). The purpose of Rule 9(b) is threefold: (1) to provide the defendant with fair notice of the claims against him; (2) to protect the defendant from harm to his reputation or goodwill; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987).

Further, in 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 105–67, 109 Stat. 737, which makes the pleading requirements for securities fraud cases even more demanding. *See Novak v. Kasaks*, 216 F.3d 300, 305–07 (2d Cir.2000). Thus, although the heightened pleading requirement of Rule 9(b) continues to apply, the more stringent pleading standards of the PSLRA govern an inquiry into the adequacy of the pleadings. *Novak*, 216 F.3d at 305–07. Under the PSLRA, in any securities fraud case alleging a material misrepresentation or omission,

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if any allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b).

Courts have recognized that it is difficult to meet the particularity requirement of Rule 9(b) when pleading market manipulation claims because, unlike misrepresentation claims, "where some aspects of the time and place and other details of the defendant's activity are within the knowledge of the plaintiff as a matter of course, . . . the mechanism of the scheme is likely to be unknown to the plaintiffs." *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1291 (S.D.N.Y.1996) (*Blech I*); *see Vandenberg*, 2000 WL 342718, *5; *Blech II*, 961 F.Supp. at 580. Courts that have recognized this problem have held that "allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *Blech II*, 961 F.Supp. at 580; *see Vandenberg*, 2000 WL

342718 *5. A claim of market manipulation under Section 10(b) and Rule 10b–5 need only specify: "(1) what manipulative acts were performed, (2) which defendants performed them, (3) and what effect the scheme had on the market for securities at issue." *Vandenberg*, 2000 WL 342718 (citing *Blech I*, 961 F.Supp. at 580).

 Applying these standards to the facts of this case, the Court finds that the complaint fails to state a claim for securities fraud under Section 10(b). In regard to the portion of the plaintiff's claim that is based on a material misrepresentation, the Court finds that the plaintiff has failed to plead that his reliance on the defendants' false statements caused his injury. *See San Leandro*, 75 F.3d at 808 (setting forth the elements of a Section 10(b) claim based on a material misrepresentation). It is well settled that causation under federal securities laws is a two-pronged inquiry: transaction causation and loss causation. *See Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir.2000). Transaction causation is a term that is used interchangeably with the word reliance. *AUSA Life Ins.*, 206 F.3d at 209; *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir.1992) (stating that the reliance element of a Section 10(b) claim is referred to as "transaction causation"); *Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 967 F.2d 742, 747 (1992). A plaintiff can sufficiently allege the existence of transaction causation when he shows that the violation in question caused him to enter into the transaction at issue. *AUSA Life Ins.*, 206 F.3d at 209. On the other hand, "[l]oss causation is causation in the traditional 'proximate cause' sense— the allegedly unlawful conduct caused the economic harm." *AUSA Life Ins.*, 206 F.3d at 209, 211–12. Thus, to satisfy both causation prongs, the plaintiff must demonstrate that the fraud caused him "to engage in the transaction and that it caused the harm actually suffered." *Suez Equity Investors*, 250 F.3d at 96. Indeed, the PSLRA requires the plaintiff to demonstrate that the act complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

 In order to sufficiently allege transaction causation, the plaintiff must set forth that the violations under consideration caused him to engage in the transaction. *See Litton Indus.*, 967 F.2d at 747. The Court finds that Price's complaint fails to make this allegation. The complaint alleges that Monroig instructed Sterling Foster employees to tell clients that Sterling Foster would honor stop loss orders because they were "good selling point" (complaint ¶ 14). The complaint also alleges that Price sent Sterling Foster a letter via certified mail instructing Sterling Foster to sell an unspecified stock when it dropped to a certain price. In addition, the complaint alleges that Sterling Foster did not honor Price's stop-loss order and contains quotes from Dogantzis, Matthews, and Monroig explaining why Sterling Foster did not honor the stop-loss order. Drawing all reasonable inferences in Price's favor, *see Koppel*, 167 F.3d at 127; *Thomas*, 143 F.3d at 36, the Court finds that Price fails to allege that a Sterling Foster representative falsely told him that Sterling Foster would honor a stop loss order and that he relied on this statement when he purchased stock.

Further, Price's allegations regarding the stop-loss order are not pled with the specificity required by Rule 9(b) or the PSLRA. He fails to identify who told him that Sterling Foster would honor a stop-loss order, if anyone, and fails to state where and when such a statement was made. *See Shields*, 25 F.3d at 1128. In addition, although Price states that he in-

vested $528,161 in Embryo and a total of $721,846 with Sterling Foster, he does not set forth the stock on which he sought to place the stop-loss order. Such allegations of misrepresentation do not provide the defendants with fair notice of the claims against them. *See DiVittorio,* 822 F.2d at 1248.

■ Similarly, although Price claims that the Sterling Foster Defendants and Dogantzis used boiler room selling tactics and misrepresented commissions, mark-ups, and mark-downs, Price does not specify the particular statements he claims are fraudulent; does not identify who made them; and fails to allege where and when they were made. *See Shields,* 25 F.3d at 1128. Such conclusory allegations are insufficient to meet the pleading requirements of Rule 9(b) or the PSLRA. *See* Fed.R.Civ.P. 9(b); *Kalnit,* 264 F.3d at 138; *Ganino,* 228 F.3d at 168; *Novak,* 216 F.3d at 305–07; *Shields,* 25 F.3d at 1128.

As such, in regard to the Sterling Foster Defendants, the Court finds that Price has failed to satisfy the transaction-loss, or reliance, element of a Section 10(b) claim based on a material misrepresentation made by the Sterling Foster Defendants.

■ The complaint alleges that BSSC's monthly statements misrepresented the prices of stocks purchased by Price because the prices were based on Sterling Foster's market manipulation rather than an independent competitive market. Price does not allege that he relied on this misrepresentation in entering into the transaction. Nor could he make such an allegation, as the monthly statements were sent after the purchases were made. Because the only misrepresentation BSSC is alleged to have made occurred after Price purchased the stock, the complaint fails to allege that the violation in question caused him to enter into the transaction at issue. *AUSA Life Ins.,* 206 F.3d at 209. Accordingly, the Court finds that Price has failed

to satisfy the transaction-loss, or reliance, element of a Section 10(b) claim based on a material misrepresentation made by BSSC.

■ In regard to the portion of the plaintiff's claim that is based on allegations of market manipulation, the Court finds that Price has failed to allege loss causation. Although the Second Circuit has set forth "somewhat inconsistent precedents on loss causation," *Suez Equity Investors,* 250 F.3d at 98 n. 1 (citing *First Nationwide Bank v. Gelt Funding Co.,* 27 F.3d 763, 769–70 (2d Cir.1994); *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992) (per curiam); *Mftrs. Hanover Trust Co. v. Drysdale Secs., Corp.,* 801 F.2d 13, 22 (2d Cir.1986)), the Court of Appeals "intends to hold defendants liable only for the reasonably foreseeable consequences of their actions." *Suez Equity Investors,* 250 F.3d at 98. The Second Circuit recently has held that loss causation embodies notions of the common law tort concept of proximate causation and foreseeability. *See Suez Equity Investors,* 250 F.3d at 98; *AUSA Life Ins.,* 206 F.3d at 216 (quoting *Mfrs. Hanover Trust Co.,* 801 F.2d at 20); *Citibank v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). Thus, loss causation " 'in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation.' " *AUSA Life Ins.,* 206 F.3d at 211–12 (quoting *Mfrs. Hanover Trust Co.,* 801 F.2d at 20). The foreseeability question is not "whether the defrauded party might conceivably still have lost, had the fraud not been practiced, but whether there was a reasonable probability that the fraud actually accomplished the result it was intended to bring about.' " *AUSA Life Ins.,* 206 F.3d at 212 (quoting *Continental Ins. Co. v. Mercadante,* 222 A.D. 181, 186–87, 225 N.Y.S. 488, 493–94 (N.Y.A.D. 1st Dept.1927)).

Here, Price claims that he was injured in connection with the purchase or sale of stock. He also alleges that the Sterling Foster Defendants and Dogantzis controlled the market for certain securities and could manipulate the price of these issues. According to the complaint, Matthews told Price that Sterling Foster could "pre-arrange a profit in an IPO for Price [by] cost averaging big blocks" of stock. Dogantzis told him that Sterling Foster could raise the price of a stock $11 or $12 by purchasing 2.5 to 3 million shares. Dogantzis also explained that when Lieberman needed money, he told Sterling Foster's brokers to "aggressively recommend" shares in a particular company, thus raising the price of that stock three or four points.

The statements of these Sterling Foster representatives describe Sterling Foster's hypothetical ability to control the market in a particular security and, thus, artificially set the price of the security. However, the complaint fails to allege that Sterling Foster manipulated the market in a security that Price purchased. Moreover, even if the complaint contained such an allegation, the manipulation described by Price inflates the prices thereby creating gains, as opposed to losses, for the investor. Simply put, the complaint does not connect Price's injury to this allegedly fraudulent conduct by the Sterling Foster Defendants. As such, Price fails to allege that the allegedly unlawful conduct caused his economic harm. *See* 15 U.S.C. § 78u–4(b)(4) (the act complained of must have caused the loss for which the plaintiff seeks to recover damages); *Suez Equity Investors,* 250 F.3d at 96 (the plaintiff must allege that the fraud caused the harm suffered); *AUSA Life Ins.,* 206 F.3d at 209, 211–12.

Even if the plaintiff had linked his injury to the statements made by the Sterling Foster representatives, the complaint still would not withstand a Rule 12(b)(6) challenge because it does not actually allege that Sterling Foster manipulated a market for securities. Rather, the quotes by Matthews and Dogantzis are hypothetical descriptions of what Sterling Foster could do. These allegations do not describe actual acts of manipulation; which defendants performed them; and a concrete effect the manipulation had on the market. *See Vandenberg,* 2000 WL 342718 *5; *Blech II,* 961 F.Supp. at 580. Applying the more lenient pleading standard some courts use in cases of market manipulation when the details of the scheme are likely to be unknown to the plaintiffs, *see Blech I,* 928 F.Supp. at 1291, a hypothetical description of the type of manipulation in which a defendant could engage is not sufficient to meet the pleading requirements of Rule 9(b) and the PSLRA. *See* Fed.R.Civ.P. 9(b); *Vandenberg,* 2000 WL 342718 *5 (holding that a claim of market manipulation under Section 10(b) need only specify: "(1) what manipulative acts were performed, (2) which defendants performed them, and (3) what effect the scheme had on the market for securities at issue"); *Blech II,* 961 F.Supp. at 580; *Blech I,* 928 F.Supp. at 1291.

█ The manipulative activity in which BSSC is alleged to have engaged includes: (1) sending Price monthly statements containing valuations that were false because they were not based on an independent market for the security but, rather, on prices set by Sterling Foster's manipulative conduct; and (2) employing Richard Harriton ("Harriton") as the individual in charge of BSSC's clearing operations when Harriton was the father of Embryo's Chief Financial Officer. However, once again, the complaint fails to allege that this allegedly unlawful conduct caused the plaintiff's injury. *See* 15 U.S.C. § 78u–4(b)(4) (the act complained of must have

caused the loss for which the plaintiff seeks to recover damages); *Suez Equity Investors*, 250 F.3d at 96 (the plaintiff must allege that the fraud caused the harm suffered); *AUSA Life Ins.*, 206 F.3d at 209, 211–12. In addition, the complaint does not allege that sending the false monthly statements and employing someone related to the CFO of Embryo affected the market for the securities at issue. *See Vandenberg*, 2000 WL 342718 *5; *Blech II*, 961 F.Supp. at 580; *Blech I*, 928 F.Supp. at 1291. Accordingly, Price's claim of market manipulation against BSSC also fails for not having been pled with the particularity required by Rule 9(b) and the PSLRA.

In sum, the Court finds that the portion of Price's Section 10(b) claim that is based on allegations of material misrepresentations must be dismissed as against the Sterling Foster Defendants and BSSC because it fails to allege transaction loss. The Court also concludes that the portion of Price's Section 10(b) claim that is based on allegations of market manipulation must be dismissed as against the Sterling Foster Defendants and BSSC because it fails to allege loss causation and is not pled with the particularity required by Rule 9(b) and the PSLRA. As such, the Court grants the motions by the Sterling Foster Defendants and BSSC to dismiss the claim pursuant to Section 10(b); and that claim is dismissed.

### 2. Control Person Liability

The complaint contains allegations that the defendants have violated Section 15 of the Securities Act and Section 20(a) of the Exchange Act. Section 15 of the Securities Act, 15 U.S.C. § 77o, provides that "any person who ... controls" any entity that violates the Securities Act "shall be liable jointly and severally" for those violations, unless the control person lacked knowledge of the events giving rise to the liability. Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a) provides that a person in control of an entity that violates the Exchange Act is jointly liable for such violations "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

 In order to establish a *prima facie* case of liability under Section 20(a), a plaintiff must show, among other things, a primary violation of the Exchange Act by the controlled person. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir.1998). Similarly, to establish a *prima facie* case of liability under Section 15, a plaintiff must show, among other things, a primary violation of the Securities Act by the controlled person. *See In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 208 (E.D.N.Y.2000). The Court has dismissed Price's claim that the defendants violated Section 10(b) of the Exchange Act. In addition, Price never pled a primary violation of the Securities Act. Accordingly, his claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act must fail. *See Boguslavsky*, 159 F.3d at 721; *In re Twinlab*, 103 F.Supp.2d at 208.

### 3. The RICO Claim

In his papers in opposition to the motion by the Sterling Foster Defendants to dismiss the complaint, Price agrees to withdraw his civil RICO claim. Thus, the Court dismisses that claim on consent of the parties.

### 4. The State Law Claims

The Sterling Foster Defendants do not move to dismiss the state law claims asserted against them, and as noted above, Dogantzis has not yet appeared in this action. Accordingly, claims two through eight remain pending against Sterling Foster, Monroig, Markowski, Matthews, and

Dogantzis. The discussion that follows pertains only to the motion by BSSC to dismiss the state-law claims Price raised against it.

### a. Claims Pursuant to the Texas Securities Act

 Price claims that BSSC violated Articles 581–7 of the Texas Securities Act ("TSA") by selling securities that were not registered for sale in the Texas. Price also alleged that BSSC violated Article 581–33 of the Texas Securities Act by "selling securities by means of untrue statements of material facts and/or omissions to state material facts to the detriment of the Plaintiff" (complaint ¶ 36).

 Article 581–7(A) of the TSA provides that "no dealer or agent shall sell or offer for sale any securities" not registered in accordance with the statute. Tex. Rev.Civ. Stat. Ann. § 581–7(A)(1). This section applies only to dealers, agents, or salesman who offer to sell a security. *See Stone v. Enstam,* 541 S.W.2d 473, 479 (Tex.Civ.App.—Dallas 1976). "If one attempts to sell, as a business, securities for himself or others, he comes within the definition of a dealer within the meaning of the Act." *Cosner v. Hancock,* 149 S.W.2d 239, 243 (Tex.Civ.App.-El Paso 1941). "A salesman is one employed by a dealer to sell, offer for sale or delivery, or solicit subscriptions to or orders for, or deal in any other manner, in securities within the State." *Id.*

The complaint does not allege that BSSC attempted to sell securities. Rather, Price asserts that BSSC cleared Sterling Foster's trades after the sale was complete. Given that BSSC is not alleged to have been a dealer, agent, or salesman who offered to sell a security, it cannot be held liable under Article 581–7(A)(1).

Article 581–33(A)(2) imposes liability on "[a] person who offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." Tex.Rev.Civ. Stat. Ann. § 581–33(A)(2). As explained above, BSSC is not alleged to have offered or sold a security, and therefore, it is also not liable under Article 581–33(A)(2).

In sum, the Court grants the motion by BSSC to dismiss the claims brought pursuant to the TSA, and those claims are dismissed as against BSSC.

### b. Claims Pursuant to the Texas Business and Commerce Code and of Common Law Fraud

 Price claims that the defendants have violated Section 27.01 of the Texas Business and Commerce Code and have committed common law fraud. "Section 27.01(a) of the Texas Business and Commerce Code imposes civil liability for false representations of material facts that are relied on by a plaintiff in entering into a real estate or stock transaction." *U.S. Quest Ltd. v. Kimmons,* 228 F.3d 399, 406 (5th Cir.2000). To establish fraud under Section 27.01(a), a plaintiff must allege (1) a false representation of a past or existing material fact; (2) made to another person; (3) with the intent to induce that person to enter into the transaction; and (4) that person relies on that representation. Tex. Bus. & Com.Code Ann. § 27.01(a); *U.S. Quest,* 228 F.3d at 406. Common law fraud in Texas requires " 'a material representation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.' " *U.S. Quest,* 228 F.3d at 403 (quoting *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998)). Clearly, the state securities fraud laws generally embody the same elements of common law

fraud, including the elements of reliance and materiality. *See id.* (citing *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 n. 4 (5th Cir.1990)).

As discussed above in regard to the Section 10(b) claim against BSSC, even assuming that the valuations in the monthly statements are material misrepresentations, Price does not allege that he relied on them in entering into the securities transaction. Nor does he allege that the alleged material misrepresentations caused him to suffer an economic loss. Having failed to claim that he relied on the alleged material misrepresentations by BSSC, Price's claims for statutory and common-law fraud cannot stand. *See* Tex. Bus. & Com.Code Ann. § 27.01(a) (providing that statutory fraud in a securities transactions includes the element of reliance); *U.S. Quest,* 228 F.3d at 403, 406 (holding that reliance is an element of common law fraud and statutory fraud). Accordingly, the Court grants the motion by BSSC to dismiss the claims for common law and statutory fraud, and those claims are dismissed as against BSSC.

### c. The Claims Pursuant to the Texas Deceptive Trade Practices Act

■ Price alleges that the defendants are liable for violations of Sections 17.46(b)(2), (b)(5), (b)(7), (b)(24), and 17.50(a)(3) of the Texas Deceptive Trade Practices Act ("DTPA"). Section 17.46 of the DTPA provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer." Tex. Bus. & Com. § 17.46(a). Subsection (b) states that "false, misleading, or deceptive acts or practices" includes the following acts:

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . .

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have. . . .

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . . [or]

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

Tex. Bus. & Com. §§ 17.46(b)(2), (5), (7), (24). Section 17.50 permits a "consumer" to maintain an action where "any unconscionable action or course of action by any person" constitutes "a producing cause of economic damages or damages for mental anguish." Tex. Bus. & Com. § 17.50(a)(3).

An eligible plaintiff under the DTPA must be a "consumer" which term is defined as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services." Tex.Bus. & Com. § 17.45(4). In turn, goods are "tangible chattels or real property purchased or leased for use." Tex. Bus. & Com. § 17.45(1). The Texas Supreme Court has defined "goods" as all things . . . which are movable at the time of identification to the contract for sale and has excluded from that definition money "or any currency of exchange that enables the holder to acquire goods." *Riverside Nat. Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex.1980); *see also Hand v. Dean Witter Reynolds, Inc.,* 889 S.W.2d 483, 497 (Tex.App.—Houston (14th Dist.) 1994); *Portland Savings and Loan Ass'n v. Bevill, Bresler & Schulman Government Se-*

*curities, Inc.,* 619 S.W.2d 241, 245 (Tex. Civ.App.—Corpus Christi 1981).

■ Thus, intangibles are not goods for the purposes of DTPA consumer status. *See Stroud v. Meister,* No. 97 Civ. 860, 2001 WL 1029529, *3 (N.D.Tex. Aug. 22, 2001) (holding that intangibles are not goods); *Riverside Nat. Bank,* 603 S.W.2d at 174 (money is not a good); *Hand,* 889 S.W.2d at 497 (commodity option contracts are not goods); *Portland Sav. & Loan Ass'n,* 619 S.W.2d at 245 (securities are not goods); *Snyders Smart Shop, Inc. v. Santi, Inc.,* 590 S.W.2d 167, 170 (Tex.Civ. App.—Corpus Christi 1974) (accounts receivable are not goods). Securities are intangibles and, therefore, not goods as that term is used in the DTPA. *See F.D.I.C. v. Munn,* 804 F.2d 860, 863 (5th Cir.1986) (stocks are not goods); *Stroud,* 2001 WL 1029529 *3 ("The purchase of intangibles, such as securities, accounts receivable, commodity option contracts, and interests in limited partnerships, does not confer 'consumer' status"); *Portland Sav. & Loan Ass'n,* 619 S.W.2d at 245 (securities are not goods).

■ The DTPA defines "services" as "work, labor or service purchased for leased for use, including services furnished in connection with the sale or repair of goods." Tex.Bus. & Com. § 17.45(2). " 'Services does not include intangible chattels such as stocks, or loans.' " *Munn,* 804 F.2d at 863 (citations omitted).

Because the complaint alleges that Price purchased securities, he has not purchased goods or services. *See* Tex.Bus. & Com. §§ 17.45(1), (2), (4), (5); *Munn,* 804 F.2d at 863; *Stroud,* 2001 WL 1029529, *3; *Riverside,* 603 S.W.2d at 174; *Portland Sav. & Loan Ass'n,* 619 S.W.2d at 245. Accordingly, Price cannot be considered a consumer under the DTPA, and his claims brought pursuant to that statute cannot succeed. In sum, the Court grants the motion by BSSC to dismiss the claims brought pursuant to the DTPA, and those claims are dismissed as against BSSC.

**d. Claim of Breach of Contract**

Price alleges that "the defendants" breached various contractual obligation. However, Price does not allege that he had entered into a contract with BSSC. Further, even drawing all reasonable inferences in light of the plaintiff, the Court is unable to locate in the complaint the elements of a contract between Price and BSSC. Accordingly, the Court grants the motion by BSSC to dismiss the claim for breach of contract, and that claim is dismissed as to BSSC.

## III. *CONCLUSION*

Based on the foregoing, it is hereby

**ORDERED,** that the motion by the Sterling Foster Defendants to stay or transfer the action is **DENIED** as moot; and it is further

**ORDERED,** that the motion by BSSC to stay the action is **DENIED** as moot; and it is further;

**ORDERED,** that the motion by the Sterling Foster Defendants to dismiss the complaint for lack of personal jurisdiction is **GRANTED** as to defendant Lieberman and **DENIED** as to defendants Monroig, Matthews, and Marowski; and it is further

**ORDERED,** that the motion by the Sterling Foster Defendants to dismiss the complaint pursuant to Rule 12(b)(6) is **GRANTED** to the extent that the federal causes of action are dismissed; and it is further

**ORDERED,** that the motion by BSSC to dismiss the complaint pursuant to Rule 12(b)(6) is **GRANTED** and the complaint is **DISMISSED** in regard to BSSC; and it is further

**ORDERED,** that counsel for the parties remaining in this action are directed to

appear before this Court on Friday, July 26, 2002, at 3:30 p.m. for a status conference, addressing, among other things, whether a plaintiff's steering committee should be appointed; and it is further

**ORDERED,** that following the conference with this Court, counsel shall proceed directly to the courtroom of United States Magistrate Judge Michael L. Orenstein to set a schedule for discovery.

**SO ORDERED.**